NOT DESIGNATED FOR PUBLICATION

No. 121,536

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of F.C.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD KUCKELMAN, judge. Opinion filed March 27, 2020. Reversed and remanded with directions.

*Jeffrey Leiker*, of Overland Park, for appellant natural mother.

*Meredith D. Mazza*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before GARDNER, P.J., ATCHESON and BRUNS, JJ.

PER CURIAM: Mother appeals the district court's order adjudicating her 13-year-old daughter, F.C., a Child in Need of Care (CINC). She argues that insufficient evidence supports the district court's conclusion. After reviewing the record in the light most favorable to the State, we agree.

*Factual and Procedural History*

On February 21, 2018, Payton Herken, a child protection specialist with the Kansas Department for Children and Families (DCF), received a report alleging Stepfather sexually abused F.C. The report indicated that Stepfather walks around the house naked and that he masturbated in his bedroom with the door open. The report also

1

stated that Stepfather took F.C. to buy bras and underwear, made her try them on for him, and asked why Mother did not wear sexy lingerie like that.

After receiving the report, Herken contacted the Criminal Investigation Division (CID) at Fort Leavenworth because Stepfather was active military. Herken and a CID agent went to F.C.'s school to talk to her. F.C. told Herken that Stepfather drinks every day and, "'[w]hen he drinks, he changes and gets angry and threatens to do stuff.'" F.C. also said she thought Mother was scared because of his drinking. F.C. reported that Mother had spoken with someone at the Army Community Service because things were bad at home. F.C. mentioned that she was afraid of Stepfather, mostly because of his drinking.

F.C. told Herken about an incident in December 2017, when Stepfather disciplined her. Stepfather made F.C. stand outside in the snow, with no shoes, for 15 minutes because he was mad that she had gotten on Snapchat. When she came inside, Stepfather told F.C. to do 20 push-ups and when F.C. failed to say "'Yes, sir'" between each push up, she had to redo them. F.C. said her Mother was present during this incident. Stepfather also took off her bedroom door and took away her bed, leaving her with a cot to sleep on for a few days to make her more appreciative of the things she had. F.C. said that Mother recorded this incident.

F.C. told Herken that Stepfather walks around the house naked in the mornings while he gets ready for work, and it makes her "uncomfortable." F.C. also reported that she once saw Stepfather masturbate when he was in his bedroom and had left the door open. F.C. said she was not sure if he had left the door open on purpose or not. F.C. said Stepfather made comments to her that Mother does not do anything romantic for him. But when asked about the reported bra shopping incident, F.C. denied that Stepfather had taken her shopping.

2

Herken believed that F.C. was frightened when she was interviewing her. When Herken explained that Mother and Stepfather would be told about the allegations, F.C. cried hysterically and begged her not to tell Stepfather.

After speaking to F.C., Herken met with Mother and reviewed the allegations in the report. Mother confirmed that Stepfather walked around the house naked, but she said it usually happened at night because he preferred to sleep naked. Mother said F.C. told her that she was uncomfortable with Stepfather walking around naked, but Mother had forgotten to talk to Stepfather about it. Mother also said she believed Stepfather had a drinking problem and that she might have been naïve to the situation. Mother denied being afraid of Stepfather but confirmed she had spoken to someone at the Community Service Center when things were "'really bad.'" Mother said she was there when Stepfather made F.C. stand in the snow, but it lasted only five minutes. Mother told Herken she also recorded Stepfather removing F.C.'s bed "'in case anything was to ever happen.'" Herken said Mother appeared fearful while she talked to her.

Herken proposed a safety plan for Mother. That plan, effective February 21 to March 21, 2018, stated that Stepfather was not to be left alone with any of the children and if an altercation occurred, Mother was to intervene and call police. Mother signed the safety plan.

On February 21, 2018, Mother, Stepfather, F.C., and her two younger siblings had a family meeting and told Stepfather they did not want him to drink anymore. Stepfather agreed he would stop and poured out the bottle of alcohol he had. The family also discussed Stepfather's nudity and he agreed to stop walking around naked.

A week later, Herken followed-up with F.C. F.C. told Herken about the family meeting and said things were getting better. F.C. said Stepfather had stopped drinking and was now wearing clothes around the house. After speaking to F.C.'s siblings, Mother

3

spoke with Herken and told her about the family meeting. Mother stated Stepfather agreed to stop drinking at the meeting and poured out his Crown Royal that night. When asked, Mother admitted that she had violated the safety plan but said she did not know it was still in effect. No evidence showed how or when Mother violated the safety plan.

On March 5, 2018, Herken received a report that Stepfather had physically and emotionally abused F.C. and her sister, but the report contained the same allegations F.C. had reported to Herken in her initial interview.

On March 13, 2018, F.C. completed a child advocacy interview. We relate here her statements during that interview. Stepfather once made her stand in the snow and made her do push-ups. Stepfather once got drunk and came into her room and tickled her stomach, which made her uncomfortable. And once after the family had gone sledding and she complained that her butt was cold, Stepfather touched her butt, making her "uncomfortable."

Stepfather came into the bathroom almost every time she showered. F.C. would try to cover herself up when Stepfather did so. Stepfather does not allow the bathroom door to be locked or a shower curtain to be put up; instead, there is only a sheer shower curtain liner. This is because Stepfather wants to know what they are doing in the bathroom. Stepfather had come in nude sometimes and had told them they should all walk around naked because it was normal.

F.C. once saw Stepfather masturbating in his bedroom and once saw on his computer that he had been searching for pornography. She once went shopping at Victoria's Secret without Stepfather and when she returned home, he made her show him what she bought. He then commented that he wished Mother would buy things like that. This made her uncomfortable. She felt safe at home as long as Stepfather was not there.

4

After the interview, Herken determined that a new safety plan was necessary. On April 2, 2018, Mother came to her office to discuss it. In the new plan, the children were not to be exposed to nudity by adults and were to have privacy in the restroom; appropriate disciplinary methods were to be used; and the family was to accept Family Preservation Services. Thus, the plan required adults to be fully clothed in the home, allowed F.C. to lock the bathroom door, prohibited Stepfather from entering the bathroom anytime F.C. was using it, and required use of an opaque shower curtain. After Herken presented the safety plan, Mother said she wanted to have someone look at it before she signed it. Herken told Mother she had 24 hours.

Mother contacted Herken about 48 hours later, saying she wanted some parts of the plan changed because they were "unreasonable." Mother wanted to remove the part allowing F.C. to lock the bathroom door, because it was a safety concern. Mother also wanted to remove the portion preventing Stepfather from entering the restroom while F.C. was in there because Stepfather might need to enter the restroom while F.C. was only brushing her teeth. Mother also refused Family Preservation Services for "privacy reasons" and did not want to go through a year-long process. Herken said she was unsure if the plan could be changed but she would talk to her supervisor. Herken never got back to Mother about that, however, and instead sent the case to the county attorney.

On April 9, 2018, the State petitioned the court to deem F.C. a CINC. The State asserted that F.C. fit the definitions of a CINC because (1) she was without adequate parental care, control, or subsistence, a condition not due solely to her parents' or custodian's lack of financial means; (2) she was without the care or control necessary for her physical, mental, or emotional health; or (3) she had been sexually abused or physically, mentally, or emotionally abused or neglected. See K.S.A. 2019 Supp. 38-2202(d)(1)-(3). On April 10, 2018, F.C. was removed from the home. Herken received a call from F.C.'s placement stating that F.C. wanted her guardian ad litem to know she did

not feel safe returning home. On April 17, 2018, Mother emailed Herken, stating that she wanted to sign the safety plan.

On December 4 and 20, 2018, the district court held an adjudication hearing. At the hearing, Herken testified to her investigation. She had no information that Stepfather continued to drink after he said he would stop at the family meeting in February. F.C. did not tell her that Stepfather was still walking around naked, but F.C. had mentioned to "somebody else" that he was.

When asked why she requested the family participate in family preservation services, Herken said family preservation would have allowed her to "monitor the case." When asked again what part of family preservation services would help the family, Herken replied they "offer counseling and things like that, but it's harder for DCF to stay involved with outside services than it would be with family preservation." Herken left F.C.'s younger siblings in the home because they had not expressed any fear of being there, and they were not going through puberty, as F.C. was.

Alyssa Blyden, a trained forensic interviewer at the Leavenworth Child Advocacy Center, conducted F.C.'s forensic interview on March 13, 2018. Blyden testified to the statements F.C. made at the interview, as reflected above. And the forensic interview was also admitted at the adjudication hearing.

*F.C.'s testimony*

F.C. testified for the State. We summarize her testimony here. She first told a friend around Halloween that she was afraid to be at home and that "things were pretty rough." She was in trouble around that time but that was not the reason she talked to her friend about what was going on. She told people that Stepfather walked around without clothes and had been doing so for as long as she could remember. She would see him

6

naked when she came downstairs to go to the bus stop in the morning, and again in the afternoon when he came home and took off his uniform before going upstairs. That had always made her uncomfortable but as she got older it made her even more so.

F.C. had told Mother she was uncomfortable with Stepfather walking around naked. Mother suggested that F.C. talk to Stepfather about it, but F.C. was too uncomfortable to do so. Stepfather said that they should all be comfortable with their own bodies and that everyone should run around the house naked. When asked if this statement made her feel uncomfortable, she said she did not really think anything of it at the time. When asked again when she began to be uncomfortable with Stepfather's nudity, F.C. said at the beginning of eighth grade.

As for the shower allegations, Mother would not allow them to lock any doors so Mother could make sure F.C. was not "messing around in the bathroom." Stepfather would "sometimes" come into the bathroom while she was naked in the shower and "randomly talk to [her.]" There was only a sheer shower curtain up so when Stepfather would come in, she would try to turn away so he could not see her. Sometimes Stepfather would come in naked and other times he was clothed. Overall, she was "really uncomfortable" with Stepfather coming into the bathroom. Her parent's shower also had only a sheer curtain liner. F.C. admitted that both Stepfather and Mother would come into the bathroom pretty regularly when all the children, not just her, were in the shower for various reasons, such as telling them to hurry up due to the shortage of hot water or because it was dinner time. But Mother would not look at her, and she would knock before entering.

Stepfather drank a lot, especially on the weekends, and he became "really angry." F.C. talked to Mother about this but "[they] were all scared" and F.C. knew Mother tried to get him to stop drinking before but he refused. Stepfather would get angry and short tempered when he drank and once, on Christmas, he got angry and threw a laptop that hit

F.C.'s sister's leg. On cross-examination, F.C. agreed that Stepfather did not intentionally throw the laptop at her sister but had swiped it out of the way, causing it to hit her sister's leg. As to Stepfather's drinking, after the family meeting in February, Stepfather poured out his bottle of Crown Royal and she had not seen him buy more.

As for the time she had to stand in the snow, F.C. was outside for 5 or 10 minutes. Before the incident, F.C. had told Stepfather something like that she hated him and did not want to have anything to do with him. She also had just had a fight with her sister and was told that she needed to "cool off." After she came in, Stepfather told her to come back inside and she said "okay" instead of "'yes, sir,'" so Stepfather made her do pushups. She and her siblings were supposed to say "'yes, sir'" and "'yes, ma'am.'" After the pushups, Stepfather pushed her against the wall and she told him she was sick of the way he was treating them. Stepfather said if she did not like what he provided for her then they could do it this way. Stepfather then removed her bed and her door, told her she could not use electricity, and took away her TV and phone. Stepfather set up a cot in her room, which F.C. slept on from December 28 until January 1.

Two nights before F.C. testified, Mother told her that she should tell people that she wanted to come home because it was the only way she could see her grandma who has cancer. F.C. told Mother she did not talk about what she would testify to, and Mother told her to tell the court she wanted to come home "only if [she] wanted to."

*Mother's testimony*

Mother testified that she has three children including F.C., the oldest. For discipline, they normally just take away cell phones or a privilege such as going to a friend's house or a birthday party. F.C. had outgrown spankings a few years ago, so now on rare occasions she would have to do pushups. F.C. has had to do pushups only about six times in her life.

The night F.C. stood outside, F.C. had been in a fight with her sister and then smarted off. She estimated that F.C. was out on the deck for maybe five minutes. F.C. was not in any type of danger at the time and did not have any injury when she came in. Stepfather gave F.C. the choice of sleeping on the floor or the cot and Stepfather talked to her about not feeling like she is owed nice things. Stepfather took the lamp, but F.C. still had an overhead light. This occurred on December 29 and she and Stepfather gave F.C. her things back on January 1.

As for the shower allegations, in past houses, they had a larger water heater but now they lived on post with one small hot water heater for the whole house. Mother told the children that since all five family members wanted to shower before bed, they had to get in and get done quickly so everyone could have hot water. To conserve water, Mother suggested that the kids turn the water on, then turn it off to shampoo and lather, and then turn the water on again to rinse off. Either Mother or Stepfather would go to the threshold of the bathroom and tell the kids to hurry up if they were taking too long. It is a house rule that the children cannot lock themselves in the bathroom. Mother related an incident when F.C. locked herself in the bathroom with her laptop.

Since the family meeting on February 21, Stepfather had drunk alcohol only once—accidently during communion at church when the cups got mixed up. Since the family meeting, things had been different. Stepfather was more involved and they all seemed to be getting along better. Stepfather no longer walks around naked. Mother believes she could stand up to Stepfather if there were an issue in the house. And Mother has since put up regular shower curtains in both bathrooms.

Mother admitted that F.C. is not a terrible girl—she was just getting in trouble for normal teenage girl situations. For example, after the snow incident, in mid-January, F.C. got in trouble for downloading Snapchat. Mother also recalled that on Halloween 2017, F.C. was supposed to be home by 9 p.m. and she missed curfew, so Mother called her and

told her to come home but F.C. did not. Stepfather went to look for her and found her with her boyfriend at a park, so they took her phone away.

As to the second safety plan, Mother explained that she took it to an attorney on post, but the attorney was gone that day and did not get back to her until the next day. Mother told the lawyer that she did not want to sign it if she was not going to uphold it and the attorney agreed. Mother called Herken and told her that she wanted to make a few changes because she did not want to sign it unless she would uphold it. Mother wanted to change the door lock provision, the provision preventing Stepfather from entering the bathroom if F.C. was in it, and the family preservation services. Mother wanted to change the requirement that Stepfather could not enter the bathroom in case Stepfather accidentally violated it by going to ask her a question while she was just in there brushing her teeth. Regarding family preservation services, Herken did not tell Mother how that could help the family; instead, she was told that it would allow DCF to check up on the family. Mother expected Herken to get back to her and let her know if her proposed changes were okay, but she never did. Had Herken told Mother that F.C. would be removed if she did not sign the safety plan, Mother would have done family preservation services "or whatever else," because F.C. is more important.

*The district court's decision*

After all the evidence was presented, the district court found F.C. to be a CINC because she was without the care or control necessary for the her physical, mental, or emotional health and she has been physically, mentally, or emotionally abused. The district court found that F.C. was subjected to emotional abuse because of Stepfather's regular nudity and his walking in on her while she was in the shower. The district court also felt Stepfather's taking the door off the hinges and removing the bed was discipline that was "over the edge" and constituted emotional abuse. The district court said he thought both F.C. and Mother were afraid of Stepfather as shown in their faces when they

10

discussed his drinking. The district court said he believed F.C. and found her to be credible and compelling. The district court also mentioned that Mother had failed to take corrective measures "until late in the game." Mother timely appeals.

*Analysis*

For an order adjudicating a child to be a CINC, "[t]he petitioner must prove by clear and convincing evidence" that the child is a CINC under one of the statutory criteria enumerated in K.S.A. 2019 Supp. 38-2202(d). K.S.A. 2019 Supp. 38-2250. The district court relied on K.S.A. 2019 Supp. 38-2202(d)(2) and (3), finding F.C. to be a CINC because she: "(2) is without the care or control necessary for the child's physical, mental or emotional health; [and] (3) has been physically, mentally or emotionally abused or neglected or sexually abused."

Mother argues that clear and convincing evidence does not support the district court's findings. Clear and convincing evidence is necessary:

> "[W]hen an appellate court reviews a trial court's determination that a child is a child in
> need of care, it should consider whether, after review of all the evidence, viewed in the
> light most favorable to the State, it is convinced that a rational factfinder could have
> found it highly probable, i.e., by clear and convincing evidence, that the child was a
> CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Evidence is clear and convincing if "the factfinder believes that the truth of the facts asserted is highly probable." 286 Kan. at 697. When we review challenges to the sufficiency of evidence, we do not pass on the credibility of witnesses, weigh conflicting evidence, or redetermine questions of fact. 286 Kan. at 705.

*There is not sufficient evidence to support the district court's conclusion that F.C. was without the care or control necessary for her physical, mental, or emotional health.*

Mother first challenges the district court's conclusion that F.C. was without the care or control necessary for her physical, mental, or emotional health. Mother argues that Stepfather stopped drinking when the family confronted him about six weeks before the State filed the CINC petition, and no one denied that Stepfather had quit drinking, aside from the one incident where he accidentally drank communion wine at church.

The State argues that sufficient evidence shows that F.C. lacked the proper care or control because it was improper for a grown adult to walk around naked in front of a 13-year-old girl and to walk in on her while she was in the shower. The State argues that although Stepfather stopped drinking in February, this did not solve the issues of him walking around naked or walking in on F.C. in the shower. Further, the State argues that F.C. told her Mother about these incidents and Mother refused to stop it from happening.

As a preliminary matter, although the district court cites K.S.A. 2019 Supp. 38-2202(d)(2) for finding that F.C. is a CINC, the district court did not make any specific findings on the care and control of F.C. Instead, the district court made explicit findings only on emotional abuse. Its only statements that we could interpret as addressing the parental care and control are:

- "I just don't know very many people that would say it's okay to raise a child by running around naked;" and
- "I think that the mother is intimidated by the stepfather, and I don't think she was able to take the proper corrective measures until late in the game."

12

Nevertheless, this court will examine the entire record, in the light most favorable to the State, to determine whether sufficient evidence supports the district court's conclusion that F.C. was a CINC under K.S.A. 2019 Supp. 38-2202(d)(2).

The State relies on the allegations originally reported by F.C. to establish that she was without proper care and control. But in determining whether a child is a CINC under K.S.A. 2019 Supp. 38-2202(d)(2), as here, the district court should examine the child's circumstances existing on the date of the adjudication hearing. *In re D.H.*, 57 Kan. App. 2d 421, 429, 453 P.3d 870, 876 (2019), *rev. denied* 311 Kan. ___ (February 27, 2020).

> "[W]e conclude the temporal scope of the circumstances to be considered by the district court in deciding whether to adjudicate a child as one in need of care must be based on the plain language of the statutory criteria upon which the court is making the adjudication decision. If the statutory criterion is framed in the present perfect tense, then the adjudication decision will depend upon a view of the child's circumstances in the past and perhaps continuing to the present. If the statutory criterion is framed in the present tense, then the adjudication decision will depend upon a view of the child's present circumstances existing on the day of the adjudication hearing." 57 Kan. App. 2d at 429, 453 P.3d at 876-77.

At the time the CINC petition was filed in this case, K.S.A. 2019 Supp. 38-2202 defined a child in need of care as:

> "(d) a person less than 18 years of age at the time of the filing of the petition or issuance of an ex parte protective custody order . . . who:
> (2) is without care or control necessary for the child's physical, mental or emotional health."

This ground in (d)(2) depends on a view of the child's circumstances in the present. "Although the 'present circumstances' may encompass circumstances existing on the date the petition was filed, the court's adjudication decision on whether a child is one in need of care should be based on the circumstances existing on the date of the adjudication

13

hearing." *In re D.H.*, 57 Kan. App. 2d at 429, 453 P.3d at 876. Because (d)(2) is written in the present tense, the court's adjudication decision whether a child is in need of care should be based on the circumstances existing on the date of the adjudication hearing. We recognize that F.C. was out of the home for over seven months before the adjudication hearing. Although we do not ignore the circumstances on the date the petition was filed, we focus on the circumstances in the home on the date of the adjudication to determine whether F.C. was without the required care and control.

Even assuming, without deciding, that Stepfather's drinking and nudity could establish that F.C. was without proper care and control, the record does not support a finding that those conditions were ongoing at the time of the adjudication hearing in December of 2018.

The evidence established that Stepfather had not drunk alcohol, aside from communion, since the family meeting on February 21, 2018. Both F.C., whom the district court found to be credible, and Mother testified to this fact. Similarly, Herken had received no reports of Stepfather drinking after the family meeting. Further, F.C. and Mother stated that at the family meeting, Stepfather also agreed to stop walking around naked. Mother testified that Stepfather no longer walked around naked, and F.C. told Herken at her February 28 interview that Stepfather was wearing clothes now. The only evidence that Stepfather continued to walk around naked after the family meeting was Herken's testimony that F.C. had told "somebody else" he still walked around naked. But the record contains no evidence about when F.C. made this statement or what timeframe she was speaking about. So even taking that evidence in the light most favorable to the State, we find no evidence that Stepfather continued to walk around naked after being told F.C. was uncomfortable with it. Thus, the evidence does not establish that Stepfather was still drinking or walking around nude at the time of the adjudication hearing.

14

This leaves us with evidence about Stepfather entering the bathroom while F.C. was showering. That evidence is not specific as to when it occurred, how often it occurred, or why Stepfather entered the bathroom. Stepfather apparently considered nudity in one's own house to be acceptable and appropriate for a long time, thus he presumably did not consider his going into the bathroom while F.C. was showering to be unacceptable or inappropriate. No evidence shows that anyone told Stepfather this behavior upset F.C., and since he had been doing so without objection for a long time, he could reasonably have inferred that no one had a problem with it. No evidence shows that Stepfather continued to enter the bathroom when F.C. was showering after the family meeting in February, although she remained in the house for another six weeks or so before the CINC petition was filed and she was removed. This indicates that Stepfather also reformed that objectionable behavior when he realized it was offensive to F.C.

Further, the State argues that F.C. was without care and control because Mother failed to address these issues with Stepfather and failed to follow the safety plans. But the evidence establishes that long before the December adjudication hearing, Mother had addressed these issues with Stepfather at the family meeting in February. Mother also testified that she put up opaque shower curtains in both bathrooms. The district court inherently recognized in its ruling that Mother had taken corrective action before the adjudication hearing, although it considered the action to have occurred "late in the game." Yet, the record contains no evidence that Mother had failed to act to protect F.C. at the time of the adjudication hearing.

The State failed to present any evidence of the care and control F.C. was or was not receiving at the time of the adjudication hearing and even expressed that it thought such evidence was irrelevant. At the hearing, Stepfather's attorney asked Mother how Stepfather was now acting. After Mother answered a few questions stating that Stepfather no longer drank, did not walk around naked, and was more involved, the State objected, arguing that it did not "believe [the evidence was] relevant to the adjudication and what

15

was going on at the time of the petition." However, as stated above, for the district court to correctly find a child a CINC under K.S.A. 2019 Supp. 38-2202(d)(2), the State had to prove by clear and convincing evidence that the child was without the care or control necessary for her physical, mental, or emotional health at the time of the adjudication hearing. See *In re D.H.*, 57 Kan. App. 2d at 429, 453 P.3d at 876. Thus, evidence of the care and control F.C. was receiving at the time of the adjudication was not only relevant but also critical to adjudicating F.C. a CINC under K.S.A. 2019 Supp. 38-2202(d)(2).

The record fails to show clear and convincing evidence supporting the district court's finding that F.C. was a CINC under K.S.A. 2019 Supp. 38-2202(d)(2). Therefore, the district court erred in adjudicating F.C. a CINC under this subsection.

*There is not sufficient evidence to support the district court's conclusion that F.C. has been emotionally abused.*

The district court additionally found F.C. a CINC under K.S.A. 2019 Supp. 38-2202(d)(3). That subsection defined a "child in need of care" as a person less than 18 years of age at the time of filing of the petition who "(3) *has been* physically, mentally or emotionally abused or neglected or sexually abused." (Emphasis added.) Both Mother and the State agree that there was no allegation or finding of sexual or physical abuse. Instead the district court's finding under K.S.A. 2019 Supp. 38-2202(d)(3) relied on alleged emotional abuse. Because this subsection, unlike K.S.A 2019 Supp. 38-2202(d)(2), uses the present perfect tense in defining who is considered a child in need of care (one who "has been" abused), we review the child's circumstances in the past and the present instead of focusing more heavily on the child's present condition. *In re D.H.*, 57 Kan. App. 2d at 429, 453 P.3d at 876.

The district court determined that F.C. suffered emotional abuse based on: Stepfather's "running around nude"; Stepfather's "walking in on" F.C. while she was in

the shower; F.C. "walking in on" Stepfather while he was masturbating; and Stepfather's "over the edge" discipline of taking the door off the hinges, removing her bed, and not letting F.C. use electricity. Mother argues that these acts do not show emotional abuse.

The State argues that the record contains sufficient evidence that F.C. suffered emotional abuse because:

- F.C. was hysterical when she first spoke about Stepfather and said she did not feel safe in her home when Stepfather was there; and
- F.C. testified that she was "uncomfortable" with Stepfather walking around naked and coming into the bathroom while she was in the shower.

The State argues that although F.C. used the word "uncomfortable," it requires little inference to believe that a 13-year-old girl would suffer "emotional harm" from these situations.

Although the State's speculation may be reasonable, it fails to constitute clear and convincing evidence of emotional abuse. "'Physical, mental or emotional abuse' means the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered." K.S.A. 2019 Supp. 38-2202(y). Harm is defined as "physical or psychological injury or damage." K.S.A. 2019 Supp. 38-2202(l). Based on the plain language of these statutes, to support a finding of emotional abuse the State must present evidence that Mother or Stepfather inflicted emotional harm on F.C.—psychological injury or damage—or caused her deterioration.

Although a psychological evaluation is not necessary, some evidence must show that Mother and/or Stepfather inflicted emotional harm on F.C. See, e.g., *In re A.H.*, 50

17

Kan. App. 2d 945, 948, 951, 334 P.3d 339 (2014) (finding emotional abuse when a child witnessed domestic violence between mother and father and then began to exhibit violent behavior towards mother); *In Interest of A.M.D.*, No. 117,320, 2017 WL 3001352, at *2-3 (Kan. App. 2017) (unpublished opinion) (finding a teacher's description of the child's appearance as crying and distraught was fully consistent with a finding of emotional harm—the child was visibly upset).

The only evidence that F.C. suffered psychological injury, damage, or deterioration was her statement that Stepfather's actions made her feel "uncomfortable." But neither F.C. nor any other witness testified to her crying, being upset, or having any other emotional reaction to Stepfather's acts. True, Herken, the DCF investigator, testified that she concluded F.C. was frightened when F.C. told her what had been happening at home. Herken testified that F.C. became hysterical when she thought what she had said would be shared with Mother and Stepfather. Although that suggests a significant emotional impact, F.C.'s reaction was to the potential disclosure of her statements, which could involve a host of factors, and was not a direct reaction to acts Mother or Stepfather had inflicted on her. The record thus lacks specific evidence that F.C. suffered psychological injury, damage, or deterioration because of Stepfather's acts.

And Stepfather's acts, although unusual and concerning, are not severe or persistent enough for us to find that they necessarily inflicted emotional harm on F.C. Although F.C. saw Stepfather masturbating one time, he was in his bedroom and the evidence fails to show he knew F.C. was home or that he intentionally left his door open. Stepfather's taking F.C.'s door off the hinges, removing her bed, and not letting F.C. use electricity were acts of discipline which, although severe, were short-term and did not deprive F.C. of essentials. Stepfather's nudity was not suggested to be for the purpose of sexual arousal but was evidently a longstanding habit he believed was healthy; nonetheless, he stopped when he realized it made F.C. uncomfortable. Similarly, the evidence shows that the family practice was to permit other family members to enter the

18

bathroom when one was showering. Stepfather apparently did so without making F.C. uncomfortable when she was younger. And the evidence fails to show that Stepfather continued to enter the bathroom when F.C. was showering after the family meeting in February.

Even viewing the record in the light most favorable to the State, we find a lack of clear and convincing evidence that F.C. was emotionally abused. We cannot uphold the district court's conclusion that F.C. was a CINC under K.S.A. 2019 Supp. 38-2202(d)(3).

In sum, upon review of the evidence in the light most favorable to the State, we conclude that the district court's adjudication of F.C. as a child in need of care under K.S.A. 2019 Supp. 38-2202(d)(2) and (d)(3) is not supported by clear and convincing evidence. Accordingly, we reverse the adjudication and remand the matter to the district court with directions to dismiss the CINC proceeding, restore legal custody to Mother, and give Mother physical custody of F.C. See K.S.A. 2019 Supp. 38-2251(a) ("If the court finds that the child is not a child in need of care, the court shall enter an order dismissing the proceedings.").

Reversed and remanded with directions.